UNITED STATES of America and Beechcraft East, Inc., Plaintiffs,

v.

The STATE OF NEW YORK and William Hennessey, As Commissioner of the Department of Transportation of the State of New York, Defendants.

No. 82–CV–993.

United States District Court, N.D. New York.

Oct. 14, 1982.

Frederick J. Scullin, Jr., U.S. Atty., Albany, N.Y., for plaintiff United States of America; William P. Fanciullo, Asst. U.S. Atty., Albany, N.Y., R. John Seibert, Attorney, Dept. of Justice, Washington, D.C., of counsel.

James J. von Oiste, Port Jefferson, N.Y., for plaintiff Beechcraft East, Inc.

Robert Abrams, Atty. Gen. of the State of New York, New York City, for defendants; Barrie L. Goldstein, David B. Roberts, Asst. Attys. Gen., Albany, of counsel.

MEMORANDUM–DECISION and ORDER

MINER, District Judge.

### I

In this action plaintiffs, the United States and Beechcraft East, Inc., seek a judgment declaring unconstitutional the statute originally introduced as New York Senate Bill No. 9450–A (S. 9450–A), entitled "AN ACT to amend the transportation law, in relation to air transportation facilities and services at Stewart and Republic airports and making appropriations therefor." Plaintiffs also seek to permanently enjoin defendants, the State of New York and William Hennessey, as Commissioner of the Department of Transportation of the State of New York, from imposing a curfew or turning off runway lights, navigation aids, and landing and take-off aids at Republic Airport, East Farmingdale, New York. The complaint is predicated upon the Federal Aviation Act of 1958, as amended, 49 U.S.C. § 1301 *et seq.*, the Noise Control Act of 1972, as amended, 49 U.S.C. § 1431, and the Airport and Airway Development Act of 1970, 49 U.S.C. § 1701 *et seq.*, as well as the Contract Clause of the United States Constitution, U.S.Const. Art. I, § 10, and the Supremacy Clause of the United States Constitution, U.S.Const. Art. VI, cl. 2.[1] Jurisdiction is conferred upon this Court by

---

1. Beechcraft East, Inc.'s motion to intervene in this action pursuant to Fed.R.Civ.P. 24(a) was granted by this Court on October 7, 1982. Beechcraft, in addition to the claims listed above, alleges violation of the Commerce Clause, U.S.Const. Art. I § 8, cl. 3. All of

Beechcraft's claims are apparently based upon 42 U.S.C. § 1983. *National Aviation v. City of Hayward,* 418 F.Supp. 417, 429 (N.D.Cal.1976). Jurisdiction is pursuant to 28 U.S.C. §§ 1331 and 1337.

28 U.S.C. §§ 1331, 1337 and 1345. Before this Court is plaintiff Beechcraft East, Inc.'s application for a preliminary injunction. Fed.R.Civ.P. 65(a).

## II

Republic Airport, located in Suffolk County, Long Island, is a general aviation airport known as a "reliever airport." In this capacity, Republic relieves New York's major commercial airports, John F. Kennedy International Airport, LaGuardia, and Newark, of general (non-commercial) aircraft. It is one of only four airports in the New York City metropolitan area whose primary function is as a reliever airport, capable of accommodating all aircraft types, around the clock, in all weather conditions.[2] In addition to the importance of Republic Airport as a reliever airport, the Federal Aviation Administration ("FAA"), Eastern Region, bases its aircraft at the airport because of ready availability on short notice.

The Metropolitan Transit Authority ("MTA") is a public benefit corporation created by special act of the New York State Legislature. N.Y. Public Authorities Law § 1260 et seq. It has the power to enter into contracts, § 1265(6), and to acquire and hold real property, § 1265(7). The MTA is independent and is not governed by the supervisory powers of the New York State Department of Transportation, § 1266(8). The MTA may be sued, § 1265(1), and held liable in tort for money damages, § 1276.

The MTA was given the authority by the State of New York to own and operate airports in 1965. In 1967, the State authorized, pursuant to the Transportation Capital Facilities Bond Act, the creation of a state debt in the amount of $250,000,000 for the purpose of the acquisition, reconstruction and improvement of airports in the State by public benefit corporations, including the MTA. In March, 1969, the State, by the Transportation Department, for the use of the MTA, purchased 296 acres from the Farmingdale Company for the enlargement of Republic.[3] During the 1970s the State, for the MTA, acquired an additional 144 acres from private owners.

On May 6, 1971, pursuant to the authority of 49 U.S.C. § 1115, the United States conveyed approximately 97 acres to the MTA, thus completing the Republic Airport site. The MTA, in exchange for the conveyance of Republic Airport property, expressly covenanted in the deed of conveyance:

> That all facilities of the Airport developed with Federal Aid and all those useable for landing and taking off of aircraft will be available to the United States at all times, without charge, for use by aircraft of any Agency of the United States in common with other aircraft....

Deed, ¶ 8 (covenant 8). MTA also promised in the deed that "any subsequent transfer of property interests conveyed hereby will be made subject to all of the covenants, conditions and limitations contained in the instrument." Deed, ¶ 5 (covenant 5).

During the past eleven years of MTA's ownership of Republic Airport, the United States, through the Federal Aviation Administration, has made nine grant awards to MTA for acquiring and improving the facilities at Republic. These awards totaled $6,820,782. The improvements have included, inter alia, the installation of navigational equipment, runway lighting, improvement of runway markings, and construction of drainage and fencing.

Among the covenants included in the grant agreements are the following:

> (1) ... not [to] dispose of or encumber its title or other interests of the site and facilities during the period of federal interest or while the Government holds bonds, whichever is longer. (Assurance

---

2. The other three reliever airports for general aviation include Teterboro Airport, Teterboro, New Jersey, Morristown Airport, Morristown, New Jersey and the Westchester County Airport, near White Plains, New York.

3. Republic Airport originally consisted of about 100 acres and began its life as an airfield used by various aircraft related firms in 1928. In 1965 the airport was open to the public for the first time. Today, Republic is comprised of 535 acres and has two hard-surfaced runways.

No. 10; Affidavit of Clarence Cook, Ex. H);

(2) The sponsor [MTA] will not enter into any transaction which would operate to deprive it of any of the rights and powers necessary to perform any or all of the covenants made herein, unless by such transaction the obligation to perform all such covenants is assumed by another public agency found by the FAA to be eligible under the Act and Regulations to assume such obligations and having the power, authority, and financial resources to carry out all such obligations. (Assurance No. 32; Affidavit of Clarence Cook, Ex. H);

(3) The Sponsor [MTA] will operate the Airport as such for the use and benefit of the public. In furtherance of this covenant (but without limiting its general applicability and effect), the Sponsor specifically agrees that it will keep the Airport *open to all types,* kinds, and classes of aeronautical use on fair and reasonable terms without discrimination between such types, kinds, and classes. Provided; That the Sponsor may establish such fair, equal, and not unjustly discriminatory conditions to be met by all users of the Airport as may be necessary for the safe and efficient operation of the Airport; And Provided Further, That the Sponsor may prohibit or limit any given type, kind, or class of aeronautical use of the Airport if such action is necessary for the safe operation of the Airport or necessary to serve the civil aviation needs of the public. (Assurance No. 18; Affidavit of Clarence Cook, Ex. H) [emphasis added];

(4) The Sponsor [MTA] will operate and maintain in a safe and serviceable condition the Airport and all facilities thereon and connected therewith which are necessary to serve the aeronautical users of the Airport other than facilities owned or controlled by the United States, and will not permit any activity thereon which would interfere with its use for airport purposes: Provided, That nothing contained herein shall be construed to require that the Airport be operated for aeronautical uses during temporary periods when snow, flood, or other climatic conditions interfere with such operation and maintenance; And Provided Further, That nothing herein shall be construed as requiring the maintenance, repair, restoration or replacement of any structure or facility which is substantially damaged or destroyed due to an act of God or other condition or circumstances beyond the control of the Sponsor. *In furtherance of this covenant the Sponsor will have in effect at all times arrangements for:*

a. Operating the airport's aeronautical facilities whenever required.

b. Promptly marking and lighting hazards resulting from airport conditions, including temporary conditions, and

c. Promptly notifying airmen of any condition affecting aeronautical use of the Airport. (Assurance No. 22, Affidavit of Clarence Cook, Ex. H) [emphasis added];

(5) All facilities of the Airport developed with Federal aid and all those usable for the landing and taking off of aircraft, *will be available to the United States at all times, without charge, for use by government aircraft in common with other aircraft....* (Assurance No. 26, Affidavit of Clarence Cook, Ex. H) [emphasis added].

In addition to these general covenants, MTA expressly agreed in the second of the nine grant agreements to operate the lighting systems funded by the grant "throughout each night of the year." (Project No. 8–36–0028–02, Government's Ex. 4).

On June 21, 1982, New York Governor Hugh L. Carey signed into law a bill amending the State's Transportation Law by adding Article 15.[4] The Article's central feature is the transfer from the MTA to the New York Department of Transportation of "all rights, title and interest in all assets, equipment and property ... used in connection with the ownership, planning, development, maintenance and operation of ... Republic airport...." Section

4. Senate Bill S. 9450–A.

400(3)(h). The Commissioner of the Department of Transportation is given the authority to operate Republic and, if he determines it to be "necessary, convenient or desirable", Section 400(3)(b), to enter into a service contract for such operations with the MTA or any other qualified operator, Section 400(3)(h). Until the Commissioner entered into such a contract, the Legislature provided that the MTA, although no longer Republic's owner, should continue to operate the airport for a transitional period not to exceed one year from the effective date of the Article. Section 400(3)(h).

Section 402(1) created the Republic Airport Commission, a citizens' advisory council, to advise the Commissioner. Finally, Article 15, in recognition of noise complaints by inhabitants who live in Republic's vicinity, included a provision, Section 402(3),[5] which imposed a mandatory 11:00 P.M. to 7:00 A.M. curfew at the airport.[6]

The Government alleges that, contrary to the deed and grant covenants, neither the MTA nor the State of New York, at any time, obtained the FAA's permission to transfer ownership of the airport from MTA to the State Department of Transportation or to deny Republic's use to the United States or to other aeronautical users between 11:00 P.M. and 7:00 A.M.[7] The Government further alleges that New York's decision to turn off runway lights and navigational aids and to declare Republic closed during curfew hours presents serious safety hazards to those using the airport for emergency night time landings, to those intending to land before 11:00 P.M. but delayed for adverse weather conditions or other reasons, and to those intending to use the lighted airport as a navigational aid while going to or from nearby LaGuardia and JFK airports. However, at a September 15, 1982 meeting between counsels of the FAA and the State, defendants agreed not to turn off runway lighting and navigational aids pending litigation of the issues in this case, in exchange for the Government's promise not to seek a preliminary injunction. Notwithstanding defendants' concession on the issue of lighting and navigational aids, defendants declined to rescind transfer of the airport or imposition of the curfew. As a result, the Government filed

5. Section 402(3) provides:

The arrival or departure of aircraft to or from the airport between the hours of 11 P.M. and 7 A.M., except in the case of emergency, and the development of additional runways at the airport are hereby prohibited, provided, however, that such prohibitions may be altered, modified or changed by resolution adopted by a majority vote of the members of the commission after giving public notice of such alteration, modification or change and holding a public hearing thereon. Any alteration, modification or change which affects the prohibition with respect to arrival and departure of aircraft shall be made only after due consideration has been given to the pe[r]iod of daylight occurring at such airport. Notwithstanding the foregoing provisions of this subdivision, the prohibition against the arrival or departure of aircraft to or from the airport between the hours of 11 P.M. and 7 A.M. shall not become effective until ninety days [September 19, 1982] after the effective date of this subdivision.

6. Defendants allege that Bill S. 9450–A, now Article 15 of the Transportation Law, was eventually passed for three reasons. First, after MTA became Republic's owner in 1969, it experienced substantial operating deficits (for example, $1.4 million in 1979, $2.1 million in 1980, $2.3 million in 1981 and an expected $3.7 million in 1982). Second, the MTA, due to its primary mass transportation function, was unable to devote sufficient time to Republic's operation. Third, Republic's facilities were expected to grow and the Department of Transportation was regarded as a more suitable state agency to foster economic development. (Affidavit of Clarence Cook, ¶ 16). The stated purpose of Article 15 corresponds with the above:

§ 400. Air transportation facilities and services at Stewart and Republic airports. 1. In order to meet present and future state needs with respect to the provision of adequate, safe and efficient air transportation facilities and services to the public, and to promote the economic development and well-being of the state, the planning, development, maintenance and operation of such facilities and services at Stewart and Republic airports may be carried out by the department and the commissioner in accordance with the provisions of this article.

7. Defendants allege that they indeed obtained FAA approval, but, at the last moment, the FAA refused to formally acquiesce in the transfer. In any event, the curfew provisions of the legislation went into effect September 20, 1982.

the instant action seeking injunctive and declaratory relief.

Beechcraft East, Inc. ("Beechcraft") is a Kansas corporation organized and existing under the laws of the State of Kansas and maintains its principal office at Republic Airport, East Farmingdale, New York. On October 1, 1972, Beechcraft and MTA entered into an agreement whereby MTA leased to Beechcraft certain land and facilities at Republic for the purpose of conducting a general aviation facility to provide, among other things, all aviation related services as well as the sale, purchase, rental and lease of aircraft. As a result of that agreement, Beechcraft has expended sums of money in the development of its general aviation facility, purchased properties and equipment necessary to perform its obligations pursuant to the agreement, and has entered into agreements with owners and lessees of aircraft, based at Republic Airport, wherein Beechcraft has agreed to provide twenty-four hour service and flights on demand, as well as cargo transfer and emergency medical flights.

Beechcraft alleges that, as a result of the curfew imposed by the defendants, many of Beechcraft's contract customers gave Beechcraft notice of their intention to relocate to other airports if a curfew is in fact imposed. Beechcraft maintains, moreover, "that as a consequence of the curfew imposed by New York Senate Bill No. 9450–A, Beechcraft East, Inc.'s business has been seriously injured and the very life and continued existence of its business has been put in jeopardy." (Complaint, In Support of Motion for Leave to Intervene, ¶ 13).

### III

In this Court a party seeking a preliminary injunction must make a clear showing of "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Sperry International Trade, Inc. v. Government of Israel,* 670 F.2d 8, 11 (2d Cir.1982); *Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 78–79 (2d Cir.1981). A preliminary injunction is an "extraordinary and drastic remedy which should not be routinely granted" except upon a clear showing that the movant has carried its heavy burden. *Buffalo Forge Co. v. Ampco-Pittsburgh Corp.,* 638 F.2d 568, 569 (2d Cir.1981); *Beech-Nut, Inc. v. Warner Lambert Co.,* 480 F.2d 801, 803 (2d Cir.1973). Moreover, where granting a preliminary injunction would adversely affect the "public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Yakus v. United States,* 321 U.S. 414, 440, 64 S.Ct. 660, 674, 88 L.Ed. 834 (1944); *New York Pathological and X-Ray Laboratories, Inc. v. Immigration and Naturalization Service,* 523 F.2d 79, 81 (2d Cir.1975). This Court believes that plaintiff Beechcraft's application for a preliminary injunction should be granted since Beechcraft has met the burden of demonstrating both prongs of this Circuit's preliminary injunction test.

### IV

#### A. IRREPARABLE HARM

Beechcraft has demonstrated that, as a result of the curfew, its customers are cancelling their agreements with Beechcraft and are "going elsewhere". In this regard, Beechcraft has presented evidence that over twenty-five [8] customers have given Beech-

---

8. These customers now include Doubleday Communications Corporation, Aero Direct, Inc.; the New York Islanders; Nassau Flyers, Inc.; *Pegasus Aeroservices Inc.;* Vanguard Instrument Corporation; Oscar de la Renta, Division of Rich Fin, Inc.; Price-Driscoll Corporation; AOPA New York Members; Assembly-

man G. Oliver Koppell; Struthers Electronics Corporation; Action Crane Corp.; Irwin & U.S.; Imperial Jalousie Corp.; Comsteel Products, Inc.; *Associated Marketing Systems, Inc.;* Mercury Paint Corp.; Aping Specialties Corp.; Precise Optics/PME, Inc., Procyon Corp.; Damin; Compac; Botie Instrument Co., Inc.;

craft notice of their intention to relocate to another airport when the curfew is imposed, and, moreover, that cancellations continue to be received by Beechcraft on an almost daily basis.

Defendants allege that, on an average basis, Republic Airport during 1981 had a total of 527 daily takeoffs and landings and only 14 of these operations—2.6 percent—occurred during the hours of 11:00 P.M. and 7:00 A.M. Therefore, since Beechcraft's business at Republic is to service aircraft using the facility, defendants contend, on the basis of the above statistics, "Beechcraft cannot claim that its viability as a business entity will be irreparably harmed if it is unable to realize revenues from its servicing of the few aircraft which will now be unable to use Republic during the hours of the curfew." (Affidavit of Clarence Cook, ¶ 28).

However, defendants have not consulted the appropriate navigational aids supplied by the Second Circuit. That Court recognized, in *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam), that "[a]s to the kind of irreparable harm that the party must show, the language of some past cases has suggested to some a spectrum ranging from possible to probable which is defined as 'not remote or speculative but ... actual and imminent.'" Yet it is clear that the preferred showing to be made must be beyond "possible irreparable injury" since, "as the great Voltaire once wrote in *Candide,* his most entertaining and perhaps most influential philosophical novel ... anything is possible in this best of all possible worlds." *Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Company,* 604 F.2d 755, 759 (2d Cir. 1979).

■ Here, Beechcraft has demonstrated a business loss that is certainly "not remote or speculative, but [is] actual and imminent". *Id.* Over twenty-five customers

have given notice that they will terminate their accounts with Beechcraft, and others have in fact transferred their business to other airports. For this loss there is no adequate remedy at law,[9] and, therefore, the fact that the loss may be only a small percentage of Beechcraft's nation-wide and international revenue is irrelevant. There is no requirement in this Circuit that a party wait until near-extinction before moving for a preliminary injunction. The law, like the Constitution, is not a suicide pact.[10]

## B. LIKELIHOOD OF SUCCESS ON THE MERITS

Beechcraft contends that the action of the State of New York in imposing a night time curfew at Republic Airport impairs its contract rights in violation of the Contract Clause of the Constitution, Article I, § 10 and impedes interstate commerce in derogation of the Commerce Clause, Article I, § 8, cl. 3. In the alternative, Beechcraft contends that New York's actions violate the Supremacy Clause of the Constitution, Article VI, cl. 2 since, (1) the transfer of the airport and the imposition of a curfew conflicts with federal interests in airport development and aviation safety, and (2) the imposition of a curfew on all aircraft users by a state under its police power authority is otherwise pre-empted by congressional legislation.

■ As a threshold matter, this Court observes that it is a cardinal principle of American jurisprudence that, given the existence of both constitutional and statutory issues in an action, "[t]he latter ... [is] to be decided first and the former not reached if the statutory claim ... [is] dispositive." *Hagans v. Lavine,* 415 U.S. 528, 543, 94 S.Ct. 1372, 1382, 39 L.Ed.2d 577 (1974). *New York City Transit Authority v. Beazer,* 440 U.S. 568, 582 n. 22, 99 S.Ct. 1355, 1364 n. 22, 59 L.Ed.2d 587 (1979); *Ashwander v.*

---

AFA, Inc.; and Advantage Food Marketing Corp.

**9.** The eleventh amendment, of course, precludes Beechcraft from obtaining compensato-

ry damages here. *See, e.g., Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

**10.** To paraphrase Justice Jackson.

*T.V.A.,* 297 U.S. 288, 346, 56 S.Ct. 466, 482, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). Moreover, there is no question that a claim under the Supremacy Clause is considered a statutory issue to be determined before resolution of any constitutional question. *Hagans v. Lavine, supra,* 415 U.S. at 549, 94 S.Ct. at 1385; *Swift & Co. v. Wickham,* 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965).

■■■ Whether a federal statute preempts the otherwise lawful authority of a state to regulate in a specific area is a question of congressional intent. "[W]e start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Therefore, if Congress expressly declares that the authority conferred by it shall be singularly federal, the States may not exercise concomitant or supplementary power over the identical activity. *Campbell v. Hussey,* 368 U.S. 297, 82 S.Ct. 327, 7 L.Ed.2d 299 (1961); *Rice v. Santa Fe Elevator Corp., supra.* Even when Congress has failed to speak expressly to the issue of federal exclusivity, an intention to create sole federal authority can be implied. *Fidelity Federal Savings & Loan Assoc. v. Reginald D. de la Cuesta,* —— U.S. ——, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). Key factors in this determination include: (1) the pervasiveness of the federal regulation, *Rice v. Santa Fe Elevator Corp., supra;* (2) dominance of the federal interest in the field of regulation, and whether nonfederal regulation obstructs the full execution of those aims, *Perez v. Campbell,* 402 U.S. 637, 649, 91 S.Ct. 1704, 1711, 29 L.Ed.2d 233 (1971).

Beechcraft contends that the Noise Control Act of 1972, 42 U.S.C. § 4901 *et seq.,* as it amends the Federal Aviation Act of 1958, 49 U.S.C. § 1301 *et seq.,* and the regulations promulgated thereunder, pre-empt the area

of noise regulation and render Article 15 unconstitutional. The leading case on this question is unquestionably *City of Burbank v. Lockheed Air Terminal,* 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973). *Burbank* involved a city ordinance which imposed a "curfew" that, in the absence of an emergency, prevented jet aircraft from taking off from privately owned Hollywood-Burbank Airport between the hours of 11:00 P.M. and 7:00 A.M. Justice Douglas, writing for a 5–4 majority, after a detailed examination and analysis of the aforementioned statutes, their legislative history, and the interplay of the pre-emption rationale of *Rice v. Santa Fe Elevator Corporation, supra,* concluded that the "pervasive nature of the scheme of federal regulation of aircraft noise" constituted pre-emption. *City of Burbank v. Lockheed Air Terminal, supra,* 411 U.S. at 633, 93 S.Ct. at 1859.

■■ However, *Burbank* recognized that Congress singled out airport proprietors and gave them special, although undefined, leeway in controlling the sources of aircraft noise directly. *City of Burbank v. Lockheed Air Terminal, supra,* 411 U.S. at 635–36 n. 14, 93 S.Ct. at 1861 n. 14; *British Airways Board v. Port Authority of New York [I],* 558 F.2d 75, 83 (2d Cir.1977).[11] The rationale for this exception is clear: since airport proprietors bear liability for excessive aircraft noise under *Griggs v. Allegheny County,* 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962), fairness dictates that they must have power to insulate themselves from that liability. *British Airways Board v. Port Authority of New York [I], supra,* 558 F.2d at 83. *See* 34 Fed.Reg. 18, 355 (1969); S.Rep. No. 1353, 90th Cong., 2d Sess. 7 (1968), *reprinted in* [1968] U.S.Code Cong. & Ad.News 2688, 2693. However, before a political entity, acting as an airport proprietor, may possess the power to abate airport noise, it must bear the responsibility, either actual or potential, for excessive airport noise. Among the bases given in *Griggs* for constitutional liability, or propri-

---

11. There were two Circuit decisions concerning the British Airways Board and the Port Authority: *British Airways Board v. Port Authority of* *New York,* 558 F.2d 75 (2d Cir.1977) and *British Airways v. Port Authority of New York,* 564 F.2d 1002 (2d Cir.1977).

etorship for *Burbank* purposes, were the entity's ability to obtain the necessary approach easements, *see British Airways Board v. Port Authority of New York [II],* 564 F.2d 1002, 1011 (2d Cir.1977), and its status as promoter, lessor, and operator of the airport. *Griggs v. Allegheny County,* *supra,* 369 U.S. at 89, 82 S.Ct. at 533. *See Town of East Haven v. Eastern Airlines, Inc.,* 331 F.Supp. 16, 30–32 (D.Conn.1971). Indeed, several other courts have expressly recognized that municipalities and other political sub-divisions of a state may fall under the so-called *Griggs* exception. *See e.g., National Aviation v. City of Hayward, Cal.,* 418 F.Supp. 417 (N.D.Cal.1976); *Air Transport Association of America v. Crotti,* 389 F.Supp. 58 (N.D.Cal.1975).

Beechcraft, however, argues that New York was acting under its police power when Article 15 was enacted and not as an airport proprietor, and, therefore, the curfew provisions are a nullity under the *Burbank* rationale. As previously noted, the rationale for the proprietor exemption to imposing curfews is to enable a proprietor to protect himself from liability for excess aircraft noise. Beechcraft contends that, at the time at which the curfew was imposed, New York had never been the proprietor of Republic and had not experienced a prior and continuing commercial interest in avoiding liability. The threat of commercial ruin from large, adverse monetary judgments underlying the "fairness" rationale for the proprietor exemption was not present when New York took over the airport, it is contended, and New York's action was a purely political act of its Legislature.[12] Therefore, Beechcraft concludes, the *Griggs* exception does not apply to a state or at least to the state acting at bar. *Cf. San Diego Unified Port District v. Gianturco,* 651 F.2d 1306 (9th Cir.1981) (where the court held that California was not acting as an airport proprietor when its transportation department promulgated curfew hours).

■■■■ This Court rejects this contention. It is well accepted that a state may act in both a proprietary and a governmental capacity. *United Transportation Union v. Long Island Rail Road Co.,* 455 U.S. 678, 102 S.Ct. 1349, 71 L.Ed.2d 547 (1982); *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976); *United States v. California,* 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936). Here, the State of New York, simultaneously with the transfer of ownership of Republic from MTA to the State, promulgated the curfew in response to local community complaints of noise pollution stemming from Republic. Although the transfer may have been for political and economic reasons and pursuant to legitimate state police power, the enactment of the curfew was an act of a proprietor. By statute, New York has waived its immunity from liability and action and has consented to suit in accordance with the same rules of law as apply to actions in the state Supreme Court against individuals or corporations. N.Y. Court of Claims Act. Therefore, since the State here faces potential liability, the rationale of the *Griggs* exception applies.

However, the Second Circuit in *British Airways Board I* held that the scope of an airport proprietor's power "to impose use restrictions based on noise considerations is defined by the limited role Congress reserved for it in the national scheme...." 558 F.2d at 84. The proper bailiwick of the proprietor is the "issu[ance of regulations] or establish[ment of requirements] as to the permissible level of noise which can be created by aircraft using the airport." S.Rep. No. 1353, *supra* at 6, *reprinted in* [1968] U.S.Code Cong. & Admin.News 2694. The State then is vested "only with the power to promulgate reasonable, nonarbitrary and non-discriminatory regulations that establish acceptable noise levels for the airport and its immediate environs. Any other conduct by an airport proprietor would frustrate the statutory scheme and unconstitutionally burden the commerce Congress sought to foster." *British Airways Board I, supra,* 558 F.2d at 84. *See also National Aviation v. City of Hayward, Cal., supra.*

---

12. *See* n. 6, and accompanying text, *supra.*

Here, the Court finds that Article 15's curfew is overbroad, unreasonable and arbitrary. The curfew extends to *all* aircraft, regardless of the *degree* of accompanying emitted noise. In fact, Article 15 makes no reference to noise levels measured in decibels as a factor in particular plane prohibition during the 11:00 P.M. to 7:00 A.M. curfew. Instead, all take-offs and landings are proscribed, except emergency flights, and all aircraft are presumed and deemed intolerable, as a matter of law, to the surrounding communities. Moreover, as the State admits, only 14 flights occur during the forbidden hours—a mere 2.6 percent of the total daily aircraft traffic. A total proscription of flights during the curfew period, it seems to this Court, is unreasonable in view of the sparsity of flights during the curfew hours. Therefore, since the curfew imposed by Article 15 at Republic extends to all aircraft, regardless of decibel level emitted by individual aircraft, and is in any event arbitrary under the circumstances of the low number of flights, the curfew provision of Article 15 is overbroad and constitutionally impermissible in view of federal pre-emption of regulations concerning noise and planes in flight. *British Airways Board I, supra.* See *Allegheny Airlines v. Village of Cedarhurst*, 238 F.2d 812 (2d Cir.1956); *see also American Airlines v. Town of Hempstead*, 398 F.2d 369 (2d Cir.1968), *cert. denied*, 393 U.S. 1017, 89 S.Ct. 620, 21 L.Ed.2d 561 (1969).

In addition, the Supremacy Clause covers not only cases where federal regulation has so pervasively pre-empted an area so as to prohibit state action of a similar character, but also where narrower conflicts between state and federal law exist, even when the subject of the conflict involves an area not otherwise pre-empted by federal regulation. "Even where Congress has not completely displaced state regulation in a specified area, state law is nullified to the extent that it actually conflicts with federal law." *Fidelity Federal Savings & Loan Assoc. v. Reginald de la Cuesta, supra,* 102 S.Ct. at 3022. *Gibbons v. Odgen,* 9 Wheat 1 [22 U.S. 1, 6 L.Ed. 23] (1824). In deciding whether a statute is in conflict with a federal statute or regulation, and ergo invalid, a court must first ascertain the construction of the federal and state statutes or regulations, and then decide the constitutional question of whether they conflict. *Perez v. Campbell, supra,* 402 U.S. at 644, 91 S.Ct. at 1708 (1971).

Here, the federal grant law requires that airports receiving federal funding be made available for use by the United States at all hours. Federal grants to airport operators are made pursuant to the Airport and Airways Development Act of 1970, 49 U.S.C. § 1701 *et seq.* Among the Act's provisions is a requirement that, as a condition to obtaining federal funding, an airport owner must give assurances, as the MTA (and now New York as MTA's successor in interest) here so covenanted, that "all of the facilities of the airport developed with federal financial assistance and all those usable for landing and takeoff will be available to the United States ... in common with other aircraft *at all times.*" (emphasis added). 49 U.S.C. § 1718(5). New York's blanket 11:00 P.M. to 7:00 A.M. curfew undeniably conflicts with the congressional mandate that Republic Airport, as a recipient of federal grant money, be open for use by the United States, and private parties, twenty-four hours a day. It is clear then that Article 15's curfew provision, since it conflicts with a federal statute and the will of Congress, is repugnant to the Constitution, and, therefore, a nullity.

V

Accordingly, Beechcraft has sustained its burden with respect to this application. A preliminary injunction order was signed on October 7, 1982.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law in support of the order heretofore made, pursuant to Fed.R.Civ.P. 52(a).

It is so Ordered.