In re IONOSPHERE CLUBS, INC. and
Eastern Air Lines, Inc., Debtors.

EASTERN AIR LINES, INC., Plaintiff,

v.

AIRLINE PILOTS ASSOCIATION,
INTERNATIONAL, Defendants.

Bankruptcy Nos. 89 B 10448, 89
N 10449 (BRL).
Adv. No. 89–6143A.

United States Bankruptcy Court,
S.D. New York.

Oct. 4, 1989.

Weil, Gotshal & Manges, New York City (Bruce R. Zirinsky, Zack A. Clement, of counsel), Akin, Gump, Srauss, Hauer & Feld, Special Labor Counsel, Washington, D.C. (John J. Gallagher, of counsel), for debtors.

Kramer, Levin, Nessen, Kamin & Frankel, New York City (Adam Harris, of counsel), for Official Committee of Unsecured Creditors.

Cohen, Weiss and Simon, New York City (Bruce H. Simon, Richard M. Seltzer, of counsel), for ALPA.

Berlack, Israels & Liberman, New York City (John P. Kraljic, of counsel), for Preferred Shareholders Committee.

BURTON R. LIFLAND, Chief Judge.

Upon the Complaint filed by Eastern Air Lines, Inc., as debtor-in-possession ("Eastern"), dated September 25, 1989 (the "Adversary Complaint"), requesting a finding and order that the action commenced by the Airline Pilots Association International ("ALPA"), captioned *Airline Pilots Association International v. Eastern Air Lines, Inc.*, Civil Action No. 89–1823, now pending

in the United States District Court for the Southern District of Florida is a violation of the automatic stay of § 362 of the Bankruptcy Code (the "Code") and is therefore a nullity, and should be dismissed immediately, or alternatively, an order pursuant to § 105(a) of the Code enjoining ALPA from proceeding, continuing or otherwise taking any action whatsoever in respect of the Lawsuit as against Eastern, and ordering ALPA to dismiss the Lawsuit; and based upon the record as presented at the October 2, 1989 hearing, the credible and largely uncontroverted testimony adduced at the hearing, and based upon the consent and request of the parties that the preliminary injunction hearing be consolidated with the proceeding on the merits of Eastern's Adversary Complaint for injunctive relief [1]; this Court makes the following findings of facts and conclusions of law, in accordance with Rule 52 of the Federal Rules of Civil Procedure (the "Federal Rules") made applicable herein pursuant to Bankruptcy Rule 7052.

### FINDINGS OF FACT

1. On March 4, 1989, ALPA, the International Association of Machinists and Aerospace Workers ("IAM"), and Local 553, Transport Workers Union of America, AFL–CIO ("TWU"), (collectively, the "Unions"), initiated a strike against Eastern. (Adversary Complaint at ¶ 1.)

2. As a result, on March 9, 1989 (the "Petition Date"), Eastern and its affiliate, Ionosphere Clubs, Inc. ("Ionosphere"), each filed a voluntary petition for relief under Chapter 11, Title 11 of the Code. (*Id.* at ¶ 2.)

3. Since the Petition Date, Eastern and Ionosphere have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Code. (*Id.* at ¶ 3.)

4. Since the Petition Date, Eastern has had to rebuild its airline in the face of the Unions' strikes. Shortly after the strike began, Eastern was flying an estimated 70 flights per day and employed approximately 1,800 employees. Currently, Eastern estimates that it offers over 600 flights per day and employs over 14,500 people. Eastern's goal is to rebuild its operations to 800 flights by the end of the year. (Transcript at 28, 30, 41; *see also,* Adversary Complaint at ¶ 4.)

5. In order for Eastern to rebuild its operations, it has been necessary to hire and train replacement pilots. (Transcript at 30–31.)

6. Because of temporary delays in graduating pilots from its training program, Eastern found it necessary to "wet lease" [leases of aircraft and crew] from Continental Air Lines, Inc. ("Continental"), a sister corporation, on a temporary short term basis in order to meet Eastern's published flight schedules. (Transcript at 30–33.)

7. In the airline industry, a "wet-lease" refers to an arrangement whereby a carrier leases aircraft and crews from another company for the purpose of performing the carrier's flying.

8. Prior to 1989, Eastern had never wet leased from another carrier.

9. Currently, Eastern has contracted for 16 wet leases involving DC–9 aircraft from Continental. Eastern plans to phase out the use of 8 of the wet leases in January, 1990 with the remaining 8 to be phased out by March 1990. Eastern currently flies approximately 80 flights per day using the wet leased aircraft which services approximately 7,000 passengers daily. (Transcript at 32–33, 35.)

10. On September 1, 1989, ALPA filed a complaint ("ALPA's Complaint") against Eastern initiating a lawsuit against Eastern which is currently pending in the United States District Court for the Southern District of Florida (the "Lawsuit")[2] to enjoin the wet-leasing arrangement. In

---

1. The parties have stipulated that the record shall embrace all of the filed papers, pleadings and annexed exhibits relating to this adversary proceeding. (Transcript at 56.)

2. *Airline Pilots Association International v. Eastern Air Lines, Inc.,* Civil Action No. 89–1823.

ALPA's Complaint, ALPA alleges, *inter alia,* that Eastern's post-petition "wet leases" from Continental violate Eastern's status quo obligations under the Railway Labor Act (the "RLA"), 45 U.S.C. § 151 *et seq.,* as embodied in the 1986 collective bargaining agreement between ALPA and Eastern (the "Agreement"). (ALPA's Complaint at ¶¶ 6–9). In ALPA's Complaint, ALPA cites the terms of § 1 of the Agreement[3] and alleges that Eastern has not acted in conformity with the provisions thereof. (ALPA's Complaint at ¶¶ 10–12).

11. Additionally, on September 12, 1989, in connection with the Lawsuit, ALPA filed a request for expedited discovery. On September 13, the District Court ordered Eastern to respond to the motion to expedite discovery by September 15, 1989. After Eastern filed its opposition to expedited discovery, ALPA filed a reply on September 18, and the District Court, on September 26, granted ALPA's motion, directing that all discovery be completed by October 25, and set the matter for trial on October 30.

12. By Order To Show Cause dated September 25, 1989, Eastern moved in this Court for a determination under § 362(a) of the Code that the Lawsuit now pending is a violation of the automatic stay and is therefore a nullity, and should be dismissed and for a temporary restraining order ("TRO") pursuant to Bankruptcy Rule 7065 enjoining, staying and restraining ALPA from continuing the prosecution of the Lawsuit as against Eastern by any means until the merits of Eastern's Adversary Complaint for an injunction against ALPA are adjudicated. Alternatively, Eastern requests that this Court issue an order pursuant to § 105(a) of the Code, enjoining ALPA from proceeding, continuing or otherwise taking any action whatsoever in respect of the Lawsuit as against Eastern, and ordering ALPA to dismiss the Lawsuit.

13. This Court granted Eastern's motion for a TRO and set the matter down for the instant hearing for a preliminary injunction.

14. The injunctive relief sought by ALPA if granted would adversely affect Eastern's ability to meet flight schedules contemplated in its April, 1989 Business Plan (the "Business Plan"). (Transcript at 34–35.)

15. These wet leases were, and are, reasonably necessary to Eastern's efforts to rebuild its operations. (Transcript at 30–35.)

16. Eastern has carefully calculated to rebuild its flight schedules on a reliable basis in order to regain the confidence of the travel agencies and the flying public. (Transcript at 29.)

17. Eastern has made demonstrable progress toward substantial resumption of its operations.

18. If the wet leases were to be enjoined, turmoil would again ensue as operations from certain cities would be forced to shut down. Such an event would also have a devastating trickling effect throughout the entire system. (Transcript at 35–37.)

19. If Eastern were required to terminate the wet leases immediately, Eastern will suffer an estimated $8 million loss of profits from wet leased operations for the 4 months of September through December. (Transcript at 50.)

20. By proceeding to enjoin Eastern from continuing with those operations, ALPA would disrupt Eastern's planned flight operations causing the estate to suffer irreparably by the substantial erosion of Eastern's operations. (Transcript at 35–37.)

21. ALPA's discovery request is extremely broad and onerous and relates to the vast grouping of issues already either decided by or pending before this Court. (*See,* Adversary Complaint, Exhibit B,

---

**3.** Section 1 of the Agreement provides:
  It is agreed that all present or future flying including flight training (except for initial factory-conducted training in newly purchased equipment), revenue flying, ferry flights, charters and wet-leases performed in or for the service of Eastern Air Lines, Inc., shall be performed by pilots whose names appear on the then-current Eastern Air Lines' System Seniority List.

ALPA's Motion For Expedited Discovery In The Lawsuit.)

22. The uncontroverted testimony established that the continuation of the Lawsuit will not only burden Eastern's estate by requiring Eastern to expend substantial resources defending the Lawsuit, but will also divert attention from an essential task in the case, that is to file with this Court what will hopefully be a revised confirmable plan of reorganization.

23. The continuation of the Lawsuit and the broad expedited discovery sought in connection therewith, will place an unnecessary and undue burden on the estate.

24. ALPA is a member of the Official Creditors' Committee in these reorganization cases and routinely appears by its separate counsel taking an active position in virtually every aspect of this case.

25. ALPA has appeared before this Court and raised the issue and propriety of the wet leases *on several separate occasions* but has *never* sought relief from this Court in connection therewith.

26. ALPA's request for relief from the Florida District Court on a matter raised by itself but not pressed in this Court, is an obvious forum shopping expedition.

27. ALPA's assertion that it has commenced the Lawsuit on behalf of and to benefit its employees who desire to return to work with Eastern is disingenuous and in contradiction to ALPA's avowed strike policies which are calculated to discourage any of its members from returning to work for Eastern. Returnees are treated by ALPA with the utmost contempt and subject to disincentive sanctions.

28. ALPA has threatened retribution and dire consequences to any striking Eastern pilots who return to work for Eastern. (*See*, Adversary Complaint, Exhibit C, Eastern's Memorandum In Opposition To Motion For Expedited Discovery including attachments.) In fact, ALPA has actively sought to discipline members who have abandoned the strike demonstrating that

ALPA's Lawsuit on behalf of these members is merely a pretext. *Id.* Indeed, ALPA has formed its Section 8 Committee, a group responsible for coordinating ALPA's punishment of strikebreakers for violation of ALPA's Constitution and By-Laws. *Id.*

29. ALPA's Code–A–Phone Message[4] of July 22, 1989, demonstrates the continuing efforts of ALPA to obtain the names of members who have crossed the picket-line.

> [T]he Article 8 proceedings against scabs are ongoing in the Atlanta Base. We need signed statements from pilots who have made contact with scabs, talked to the scabs and seen scabs at work. This is your chance to push people who have jeopardized your career in their own jeopardy.

(*See*, Adversary Complaint Exhibit C).

30. Among the documents requested by ALPA in the Lawsuit is a copy of the preferential recall list maintained by Eastern which contains the names of those pilots who have abandoned the strike by offering to return to Eastern. However, ALPA has stated in no uncertain terms that:

> [P]ilots who have called or gone in to have their names put on a recall list will be removed from the list of those eligible to draw strike benefit checks ... [and] are considered to be scabs.... [T]he act of signing up for recall subjects every pilot doing so to the filing of Article 8 charges and the implementation of a minimum of $10,000.00 fine, even if the individual has resigned from ALPA.

*See*, Adversary Complaint Exhibit C, August 13, 1989, ALPA Code–A–Phone Message.

31. ALPA's discovery requests are at least partially in furtherance of its internal union disciplinary activities directed against pilots who have returned or offered to return to Eastern.

32. ALPA did not present any evidence of unredressable harm should the proposed injunction be granted.

---

4. The ALPA Code–A–Phone is a communications service that ALPA provides to its members in order to keep them updated regarding strike matters. Members access the messages, which change daily, by dialing a toll-free "800" telephone number.

33. Substantial resumption of Eastern's flight operations, although antithetical to the goals of the Unions is in the public interest.

34. ALPA's conduct has caused and, unless enjoined or otherwise ordered, will continue to cause, immediate, substantial and irreparable injury to Eastern and its creditor body.

35. The injunctive relief sought by Eastern is essential to its ability to rebuild its operations and to reorganize.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this core proceeding for injunctive and declaratory relief pursuant to 28 U.S.C. § 157(b)(1) and (2).

2. Pursuant to 28 U.S.C. § 1334(d), the "district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all of the property, wherever located of the debtor ... and of property of the estate." The District Court's jurisdiction has been referred to this Court by the "Standing Order of Referral of Cases to Bankruptcy Judges." dated July 10, 1984 (Ward, Acting C.J.).

3. Bankruptcy courts have jurisdiction to "hear and determine ... all core proceedings ... arising in a case under title 11." 28 U.S.C. § 157(b)(1).

4. This Court's jurisdiction is further defined by § 157(b)(2)(A), which states in pertinent part as follows:

Core proceedings include, but are not limited to

(a) matters concerning the administration of the estate.

5. The purpose of the protection provided by Chapter 11 is to give the debtor a breathing spell, an opportunity to rehabilitate its business and to enable the debtor to generate revenue. *See, In re Johns–Manville Corp.*, 801 F.2d 60, 62 (2d Cir. 1986); *In re Talladega Steaks, Inc.*, 50 B.R. 42 (Bankr.N.D.Ala.1985).

6. It has been recognized that the bankruptcy court has jurisdiction to hear all matters in order to expeditiously and effectively administer the estate. *See, e.g., In re Lion Capital Group*, 46 B.R. 850, 856 (Bankr.S.D.N.Y.1985); *In re Wood*, 825 F.2d 90, 92 (5th Cir.1987).

7. The filing of a petition in bankruptcy creates an estate that encompasses "all legal and equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a). This provision has been broadly construed. "The scope of [§ 541(a)(1)] is broad. It includes all kinds of property, including tangible or intangible property, causes of action ... and all other forms of property currently specified in Section 70a of the Bankruptcy Act." *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n. 9, 103 S.Ct. 2309, 2313 n. 9, 76 L.Ed.2d 515 (1983) (quoting S.Rep. No. 989, 95th Cong., 2d Sess. 82 (1978), *reprinted in* 1978 U.S.Code Cong. Admin.News 5787, 5868).

8. "[T]he Paramount policy and goal of Chapter 11, to which all other bankruptcy policies are subordinated, is the rehabilitation of the debtor. This policy was clearly articulated by the United States Supreme Court in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) which stated '[t]he fundamental purpose of reorganization is to prevent the debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources.'" *In re Ionosphere Clubs Inc.*, 98 B.R. 174, 176–77 (Bankr.S.D.N.Y.1989) (quoting *Bildisco*, 465 U.S. at 528, 104 S.Ct. at 1197).

9. Eastern initially sought a preliminary injunction. The traditional standards for granting a preliminary injunction pursuant to Federal Rule 65 made applicable herein pursuant to Bankruptcy Rule 7065, require the party requesting the preliminary relief to show:

(i) a substantial likelihood that the movant will prevail on the merits;

(ii) movant will suffer irreparable injury unless the injunction is issued; and

(iii) the threatened injury to the movant outweighs any harm the proposed injunction may cause the opposing party.

*See e.g., New York Path. & X–Ray Lab., Inc. v. Immigration & Naturalization*

*Service,* 523 F.2d 79, 81 (2d Cir.1975); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam); *In re Feit & Drexler, Inc.,* 760 F.2d 406, 415 (2d Cir.1985); *Abdul Wali v. Coughlin,* 754 F.2d 1015 (2d Cir.1985); *Procter & Gamble Co. v. Chesebrough–Pond's, Inc.,* 747 F.2d 114, 118 (2d Cir. 1984).

10. In cases arising under the Railway Labor Act, an additional factor of primary concern to the courts is the public interest in the continuation of service. *Long Island Ry. Co. v. IAM,* 709 F.Supp. 376, 388 (S.D.N.Y.1989), *mod. and aff'd,* 874 F.2d 901, 910–911 (2nd Cir.1989); *Ozark Air Lines, Inc. v. Air Line Pilots Association,* 361 F.Supp. 198, 202 (E.D.Mo. 1973); *Trans International Airlines, Inc. v. International Brotherhood of Teamsters,* 650 F.2d 949, 967 (9th Cir.1980), *cert. denied,* 449 U.S. 1110, 101 S.Ct. 918, 66 L.Ed.2d 839 (1981).

11. Additionally, pursuant to § 105(a) of the Code, "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). "[T]he Bankruptcy Court has authority under § 105 broader than the automatic stay provisions of § 362 and may use its equitable powers to assure the orderly conduct of the reorganization proceedings." *LTV Steel Co., Inc. v. Board of Education of the Cleveland City School District ("LTV"),* 93 B.R. 26, 29 (S.D.N.Y.1988) (quoting *In re Baldwin–United Corp. Litig.,* 765 F.2d 343, 348 (2d Cir.1985)); *see also, In re Johns–Manville Corp. ("Manville I"),* 91 B.R. 225, 227 (Bankr.S.D.N.Y.1988); *In re Chanticleer Associates, Ltd.,* 592 F.2d 70, 74 (2d Cir.1979) ("The Court's power to preserve its jurisdiction by enjoining proceedings that would remove property from the bankrupts estate is fundamental to the scheme of the Bankruptcy Act").

12. [T]he exceptions to the automatic stay of § 362(a) which are set forth in § 362(b) are simply exceptions to the stay which protect the estate automatically at the commencement of the case and are not limitations upon the jurisdiction of the bankruptcy court or upon its power to enjoin. The power is generally based upon section 105 of the Code. The court will have ample power to enjoin actions excepted from the automatic stay which might interfere in the rehabilitative process whether in a liquidation or reorganization case.

2 *Collier on Bankruptcy,* ¶ 362.05 at 362–43 (15th ed. 1988).

13. "Since injunctions in bankruptcy cases are authorized by statute, the usual equitable grounds for relief, such as irreparable damage, need not be shown." *In re Neuman,* 71 B.R. 567, 571 (S.D.N.Y.1987); *see, LTV,* 93 B.R. at 29. "Instead, the bankruptcy court may 'enjoin proceedings in other courts when it is satisfied that such a proceeding would defeat or impair its jurisdiction with respect to a case before it.'" *Manville I,* 91 B.R. at 228 (quoting *LTV,* 93 B.R. at 29); *see also, In re Johns–Manville Corp. ("Manville II"),* 26 B.R. 420, 425 (Bankr.S.D.N.Y.1983), *aff'd,* 40 B.R. 219 (S.D.N.Y.1984) *rev'd in part,* 41 B.R. 926 (S.D.N.Y.1984). *See also, Continental Illinois National Bank v. Chicago,* 294 U.S. 648, 675, 55 S.Ct. 595, 605–06, 79 L.Ed. 1110 (1935) ("The power to issue an injunction when necessary to prevent the defeat or impairment of its jurisdiction is inherent in a Court of Bankruptcy, as it is in a duly established Court of Equity."); *A.H. Robins Co. v. Piccinin,* 788 F.2d 994, 1008 (4th Cir.), *cert. denied,* 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986).

14. Injunctive relief is " 'an extraordinary and drastic remedy which should not be routinely granted except upon a clear showing that the movant has carried its heavy burden.'" *In re Anje Jewelry Co.,* 47 B.R. 485, 487 (Bankr.E.D.N.Y.1983) (quoting *United States v. State of New York,* 552 F.Supp. 255, 261 (N.D.N.Y.1982), *aff'd,* 708 F.2d 92 (2d Cir.1983), *cert. denied,* 466 U.S. 936, 104 S.Ct. 1907, 80 L.Ed.2d 456 (1984)).

15. "[I]t is necessary to present strict proof of the facts and circumstances proving the likelihood of irreparable harm. Speculative and conclusory allegations are clearly insufficient." *Dore & Associates*

*Contracting, Inc. v. American Druggists' Insur. Co.*, 54 B.R. 353, 358 (Bankr.W.D. Wisc.1985). *See also, Manville Corp. v. Equity Security Holders Committee*, 801 F.2d 60, 68 (2d Cir.1986).

16. Section 362(a) of the Bankruptcy Code provides in pertinent part as follows:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302 or 303 of this title ... operates as a stay, applicable to all entities, of—

(1) the commencement or continuation ... of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

\* \* \* \* \* \*

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.

\* \* \* \* \* \*

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title.

17. "The automatic stay prevents creditors from reaching the assets of the debtor's estate piecemeal and preserves the debtor's estate so that all creditors and their claims can be assembled in the bankruptcy court for a single organized proceeding." *In re Ionosphere Clubs, Inc.*, 105 B.R. 761, 763 (Bankr.S.D.N.Y.1989) (citing *In re Colin, Hochstin Co.*, 41 B.R. 322, 325 (Bankr.S.D.N.Y.1984)). *See also, In re Ionosphere Clubs, Inc.*, 105 B.R. 765, 769 (Bankr.S.D.N.Y.1989).

18. The automatic stay permits the debtor-in-possession and its management to have a breathing spell from creditors pursuing their claims and causes of action so they may concentrate on the debtor's business and rehabilitation effort. *Manville II*, 26 B.R. at 425, 430.

19. Although it is not entirely clear based on the record developed as to whether the automatic stay pursuant to § 362(a)(1) and (6) is directly implicated here, ALPA's Lawsuit to enjoin the use of "wet-leasing" impedes Eastern's reorganization efforts and obstructs Eastern in its rebuilding efforts by controlling the manner in which it uses its assets, and as such, violates § 362(a)(3) of the Code.

20. This Court has previously held that § 1113 "in part overturns the Supreme Court's decision [in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984)] by forbidding unilateral rejection prior to a court hearing and ruling upon an application to reject a collective bargaining agreement." *In re Carey Transp., Inc.*, 50 B.R. 203, 206 (Bankr.S.D. N.Y.1985), *aff'd*, 816 F.2d 82 (2d Cir.1987). *Accord, In re Unimet Corp.*, 842 F.2d 879, 884 (6th Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 81, 102 L.Ed.2d 57 (1988) ("Section 1113 unequivocally prohibits the employer from unilaterally modifying any provision of the collective bargaining agreement.")

21. Section 1113(f) of the Code, provides as follows:

No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section.

22. As stated by ALPA, § 1113 of the Code has clearly been implicated here:

Bankruptcy Code Section 1113 makes clear, on its face and as universally interpreted, that a collective bargaining agreement, and in terms of an RLA carrier, the status quo as embodied in the collective bargaining agreement, *is subject exclusively to Section 1113.* (emphasis added.)

ALPA's Memorandum of Law at 13.

23. It is clearly contemplated by the case law that the court primarily charged with the application of § 1113 in a

bankruptcy case is the reorganization court wherein the case is pending. *See, In re Century Brass Products, Inc.,* 795 F.2d 265, 273 (2d Cir.1986), *cert. denied,* 479 U.S. 949, 107 S.Ct. 433, 93 L.Ed.2d 383 (1986); *Truck Drivers Local 807 v. Carey Transp., Inc.,* 816 F.2d 82, 87–88 (2d Cir. 1987).

24. Whether or not the District Court is an appropriate forum to resolve the issue of wet-leasing as it is impacted by § 1113(f) of the Code need not be decided in this instance as there would be a substantial and irreparable detrimental impact on this reorganization should another court issue an injunction under these circumstances.

25. The issues raised in ALPA's Complaint go right to the heart of a core matter involving the administration of this reorganization and is thus subject to the jurisdiction of this Court which has exclusive jurisdiction over the administration and assets of the estate. (28 U.S.C. § 157(b)(1) and (2).)

26. Pursuant to *Brotherhood of Ry. Clerks v. Florida East Coast Ry. Co.,* 384 U.S. 238, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966), Eastern has demonstrated that the limited use of wet leasing is "truly necessary in light of the inexperience and lack of training of the new labor force or the lesser number of employees available for the continued operation" during ALPA's sympathy strike. *Id.* at 248, 86 S.Ct. at 1425.

27. Given the ALPA policy of retribution and sanctions leveled against any returning pilots, (*see* Findings, *supra,* at ¶¶ 27–31), the asserted purpose of the anti wet lease suit brought by ALPA to protect the interests of pilots on the "Eastern Air Lines' System Seniority List" willing to return and thereby averting any need for wet leasing is pretextual and as such constitutes a separate ground for the grant of injunctive relief.

28. Even under the irreparable harm standard of this Circuit, Eastern will suffer irreparable harm if an injunction is not granted, because money damages cannot adequately compensate for the substantial loss of business and good will which potentially will result if the Lawsuit is not enjoined.

29. At the conclusion of the hearing, both parties requested this Court to rule on the merits as to permanent relief. (Transcript at 59.) However, even in the context of preliminary relief, a likelihood of success on the merits on the part of Eastern in establishing the harm to the reorganization, the jurisdiction of this Court and the nexus between §§ 1113, 105 and even perhaps to a lesser extent 362 of the Code was established.

30. The balance of hardships tips decidedly in favor of Eastern in that it has clearly demonstrated that if ALPA is successful in its quest for injunctive relief in the Lawsuit, Eastern's operations and its business in general will be severely disrupted.

31. The threatened injury to Eastern outweighs any harm the proposed injunction may cause ALPA.

32. The injunction would not be adverse to the public interest and, in fact, it is in the public interest to allow Eastern's continuation of services in this regard.

33. Eastern's request for a permanent injunction is hereby granted.

The foregoing shall constitute this Court's findings of fact and conclusions of law.[5]

In accordance with the foregoing an Order has been simultaneously entered.

---

**5.** Any finding that may more properly be considered a conclusion and any conclusion that may more properly be considered a finding shall be so construed.