In re IONOSPHERE CLUBS, INC. and Eastern Air Lines, Inc., Debtors.

EASTERN AIR LINES, INC., Plaintiff,

v.

Moreton ROLLESTON, Jr., J.P. Tristani, Bobby E. Morrow, Robert M. Wilber, Jr., Roger Wyatt, Moreton Rolleston III, Kenneth W. McDonald, Fred Kruger, Tom Welch, Paul White, Roger W. Tracy, William R. Conaway, George Hill, Frederick H. Mesmer, Lawrence A. Link, Ted Birke, James Hughes, William C. Hodgson, Jr., Defendants.

Bankruptcy Nos. 89 B 10448 (BRL), 89 B 10049 (BRL).
Adv. No. 90-5591A.

United States Bankruptcy Court, S.D. New York.

March 14, 1990.

Weil, Gotshal & Manges by Howard B. Comet, New York City, Weil, Gotshal & Manges by Zack A. Clement, Houston, Tex., for debtors.

Akin, Gump, Strauss, Hauer & Feld by Joel M. Cohn, Washington, D.C., Sp. Labor Counsel, for debtors.

Kramer, Levin, Nessen, Kamin & Frankel by Adam Harris, New York City, for Official Committee of Unsecured Creditors.

## MEMORANDUM DECISION ON MOTION FOR A DETERMINATION OF AUTOMATIC STAY VIOLATION AND FOR A SECTION 105 INJUNCTION

BURTON R. LIFLAND, Chief Judge.

### BACKGROUND

This adversary proceeding (the "Rolleston Adversary Proceeding") filed by Eastern Air Lines, Inc. ("Eastern") to enjoin defendant Moreton Rolleston, Jr. ("Rolleston") and 17 formerly striking Eastern Pilots (collectively the "Rolleston Plaintiffs") from proceeding in an action filed in the Federal District Court in Georgia entitled *Tristani et al. v. Eastern Air Lines, Inc. et al.*, No. 1:90–CV–318–JTC (N.D.Ga., filed February 12, 1990) (the "Rolleston Lawsuit"), is the latest in a series of lawsuits and proceedings involving similar, if not identical, issues and subject matter. *See, In re Ionosphere Clubs, Inc.*, slip op. No. 89 Civ. 8250 (MBM) at 4–5, 1990 WL 5203 (S.D.N.Y. January 24, 1990).

*The ALPA Strike*

On March 4, 1989, the International Association of Machinists and Aerospace Workers, AFL–CIO ("IAM") initiated a strike against Eastern. Thereafter, both the Air Line Pilots Association, International ("ALPA") and Local 553, Transport Workers Union of America, AFL–CIO ("TWU") initiated a sympathy strike. As a result thereof, on March 9, 1989, Eastern and its affiliate, Ionosphere Clubs, Inc. ("Ionosphere"), each filed a voluntary petition for relief under Chapter 11, Title 11 of the Bankruptcy Code (the "Code"). Since their bankruptcy filing, Eastern and Ionosphere have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Code. *In re Ionosphere Clubs Inc.*, 108 B.R. 901, 908 (Bankr.S.D.N.Y.1989).

"ALPA is the authorized collective bargaining representative under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*, for all airline pilots employed by Eastern. ALPA and Eastern have been parties to successive collective bargaining agreements for over forty-five years. The most recent ALPA–Eastern collective bargaining agreement (the "Agreement") is dated February 23, 1986, and became amendable (*i.e.,* subject to renegotiation) on July 1, 1988." *In re Ionosphere Clubs, Inc.,* 105 B.R. 761, 761–62 (Bankr.S.D.N.Y.1989).

"Since the Petition Date, Eastern has had to rebuild its airline in the face of the Unions' strikes." *In re Ionosphere Clubs, Inc.,* 105 B.R. 773, 774 (Bankr.S.D.N.Y. 1989). ALPA's strike forced the cancellation of over 90% of Eastern's scheduled flights. Over 95% of Eastern's pilots joined the strike, initially reducing Eastern's pilot workforce from over 3,500 pilots to 214 pilots. In order to rebuild its operations, Eastern has found it necessary to recruit, hire, train and place in active service new hire pilots as permanent replacements for its striking pilots. *In re Ionosphere Clubs, Inc.,* 105 B.R. at 774. "Eastern has carefully calculated to rebuild its flight schedules on a reliable basis in order to regain the confidence of the travel agencies and the flying public." *In re Ionosphere Clubs, Inc.,* 105 B.R. at 775. "Eastern has made demonstrable progress toward a substantial resumption of its operations." *Id.* As of November 1, 1989, Eastern had restored 73% of its pre-strike level of operations (based upon flights per day).

On November 22, 1989, ALPA notified Eastern that its sympathy strike had been concluded and that the approximately 2,000 striking pilots were willing to return to work. At that time, Eastern had outstanding a pilot bid to insure proper staffing for future scheduled operations. Section 28 of the Agreement establishes a procedure by which pilots may exercise their seniority to determine their assignment to a particular domicile (geographic base), category position (captain, first officer and second officer) and aircraft equipment type (*e.g.,* Boeing 727). Section 28 establishes fixed periods within which Eastern must conduct annual and semi-annual bids in order to assign pilot positions projected in its operational plans. When conditions necessitate modifications to Eastern's business plan outside of these fixed periods, the Agreement provides for an optional bid to effectuate any adjustments to pilot positions. Document 28 attached to the Agreement provides for the use of "flow bids" to make minor adjustments to Eastern's crew resources between standard § 28 bids.

Eastern asserts that no provision of the Agreement requires that striking pilots be eligible to participate in § 28 bids during a strike, or that such pilots have a right to displace active pilots or to return to their pre-strike category positions upon the conclusion of a strike. Eastern also maintains that at the time of ALPA's offer to return to work, Eastern had in active service sufficient replacement pilots, reinstated former striker pilots, and pilots who elected not to strike, to fill all the positions covered by the outstanding pilot bid. Consequently, Eastern claims that it did not have, and currently does not have, any vacant pilot positions available for the unreinstated former strikers.

On December 11, 1989, Eastern moved by order to show cause pursuant to §§ 105 and 362(a)(3) of the Code, and Bankruptcy Rule 7065, and filed a summons and complaint entitled *Eastern Air Lines, Inc. v. ALPA* (*In re Ionosphere Clubs, Inc.*), No. 89–6590A (Bankr.S.D.N.Y. filed Dec. 11, 1989) (the "ALPA Adversary Proceeding"). Eastern requested a temporary restraining order and preliminary injunction enjoining ALPA and Eastern's Master Executive Council ("MEC") from prosecuting, or directly or indirectly assisting (through financial assistance or otherwise) any individual pilot in prosecuting any group or individual grievance or any judicial complaint, other than a complaint filed in this Court, (a) arising out of Eastern's refusal to permit striking pilots or formerly striking pilots to bid on the pilot bids issued on May 3, July 19, October 13, and November 6, 1989, including specifically a series of grievances filed by ALPA during and since the end of its strike or (b) arising out of

Eastern's refusal to return formerly striking pilots to their pre-strike category positions.

By its complaint in the ALPA Adversary Proceeding, in addition to the injunctive relief summarized above, Eastern also sought a declaratory judgment that (a) any grievances challenging Eastern's refusal to permit striking or formerly striking pilots to bid on annual, semi-annual, optional or flow bids are without merit as a matter of fact and law; (b) Eastern is not required to displace in any respect any active pilots currently flying in revenue service in order to make their positions available to returning strikers; and (c) Eastern may continue in effect the temporary work rule changes that it implemented after the commencement of ALPA's strike for a reasonable period of time.

On December 11, 1989, this Court granted Eastern's request for a temporary restraining order pending a preliminary injunction hearing scheduled for December 15, 1989. On December 13, 1989, ALPA filed a motion to withdraw the reference and then to have the District Court for the Southern District of New York transfer that case to the District Court for the Southern District of Florida where another Eastern/ALPA lawsuit is currently pending involving the displacement of returning strikers by trainees. ALPA's withdrawal/transfer motion was assigned to District Judge Mukasey. On December 15, 1989, Judge Mukasey entered an order staying ALPA's prosecution of its bid grievances and staying prosecution of Eastern's adversary complaint, pending determination of ALPA's motion to withdraw the reference. After briefs and oral argument on ALPA's motion, Judge Mukasey entered an order on December 29, 1989, lifting his stay as to the prosecution of Count II of Eastern's complaint in the ALPA Adversary Proceeding, which involves the application of § 362(a)(3) of the Code to ALPA's prosecution of its bid grievances.

Subsequently, on January 24, 1990, Judge Mukasey issued a lengthy opinion essentially denying ALPA's motion to withdraw the reference and motion to transfer with respect to all of the issues presented in the ALPA Adversary Proceeding, including the central underlying issue of whether unreinstated strikers had any right to displace Eastern's current pilot work force. *See, In re Ionosphere Clubs, Inc.,* slip op. No. 89 Civ. 8250 (MBM) (S.D.N.Y. January 24, 1990). Judge Mukasey's decision is controlling in giving this Court the jurisdiction to decide (i) whether efforts to assert pilot bid grievances violate the automatic stay, and (ii) the merits of the asserted bid grievances. *Id.* at 25–26. An important basis for Judge Mukasey's decision was that the issues presented in the ALPA Adversary Proceeding are crucial to Eastern's ability to reorganize, a fact admitted by ALPA during oral argument. As Judge Mukasey noted:

> … ALPA concedes that these disputes involve potentially staggering cost to Eastern. At oral argument ALPA's counsel agreed that the outcome of these disputes 'will determine whether or not any reorganization is possible at all,' (12/28/89 Tr. 22) and that potential damages involve 'astronomical sums.' (*Id.* at 23). Nor did ALPA contest Eastern's claim that uncertainty surrounding this dispute has inhibited Eastern from presenting a plan of reorganization; indeed, ALPA endorsed that claim. (*Id.* at 22–23).

*In re Ionosphere Clubs, Inc., supra,* slip op. at 23.

The ALPA Adversary Proceeding is currently scheduled for trial on March 27, 1990. Pending the trial, ALPA has stipulated not to take any action to present in any other forum any of the issues presented in the ALPA Adversary Proceeding. It should also be noted that ALPA has moved for a rehearing of Judge Mukasey's January 24, 1990 decision. The Rolleston Lawsuit represents an extra forum advancement of the litigation activity stayed as to ALPA.

*The Rolleston Lawsuit*

On February 12, 1990, defendant Rolleston filed on behalf of his son, Moreton Rolleston, III, and 16 other formerly strik-

ing Eastern pilots (the "Rolleston Plaintiffs") a purported class action in the federal district court in Georgia (the "Rolleston Lawsuit"). Rolleston has appeared previously in the Eastern Chapter 11 case, ostensibly to represent the public interest and requesting compensation therefore [1]. The purported class includes "approximately 1,800 former [unreinstated] striking pilots." In addition to Eastern, the Rolleston Lawsuit names as defendants Texas Air Corporation, Jet Capital Corporation, Frank Lorenzo, Hawthorne Associates, Inc., and Trust Administrative Committee of B Plan as the Fiduciary of B Plan. On February 26, 1990, the Rolleston Plaintiffs filed an amendment to their original complaint (the "Rolleston Complaint"). The Rolleston Complaint alleges violations of the Railway Labor Act ("RLA"), the Racketeer Influenced and Corrupt Organization Act ("RICO"), and 42 U.S.C. § 1983 (deprivation of civil rights).

Specifically, the Rolleston Lawsuit contains three primary claims. First that Eastern has violated the RLA, RICO, and 42 U.S.C. § 1983 by refusing to accept bids from striking or formerly striking pilots. (*See*, Rolleston Complaint at 8–11.) The factual issues underlying this claim are virtually identical to those raised in the ALPA Adversary Proceeding in which Eastern alleges that, *inter alia*, ALPA's prosecution of certain pilot bid grievances violated the automatic stay provision of § 362 of the Code. Eastern asserts in both this Rolleston Adversary Proceeding and in the ALPA Adversary Proceeding that the effect of such participation would be the displacement of Eastern's active pilots. Eastern also maintains that the relief sought by Count I of the Rolleston Complaint and the relief sought by ALPA in the grievance arbitrations, if granted, will: (1) cost Eastern tens of millions of dollars; (2) interfere with Eastern's relationship with its current pilot workforce; (3) damage the morale of

Eastern's current pilot workforce; (4) dramatically reduce and possibly eliminate Eastern's ability to operate its flight schedule pursuant to its business plan; (5) impair the feasibility of any plan of reorganization; (6) have a material adverse impact on Eastern's ability to pay its creditors under a reorganization plan; (7) damage the going-concern value of Eastern's assets; and (8) constitute a distribution of value to certain unreinstated former strikers.

Second and third, the Rolleston Lawsuit claims that Eastern has violated RICO by allegedly failing to fund its pilot pension plan, and by allegedly failing to pay interest on certain pension benefits that have already been paid. (*See*, Rolleston Complaint at 18, 24.) Eastern asserts that both of these issues involve the resolution of claims which will be decided in connection with confirmation of Eastern's plan of reorganization.

Additionally, Eastern maintains that these allegations in the Rolleston Complaint assert claims, contingent and otherwise, which are plainly pre-petition claims. First, Eastern contends that all claims with respect to minimum funding contributions to the pension plans are pre-petition claims. Second, to the extent that the Rolleston Compliant asserts a claim for underfunding of the Pilots' A Plan, Eastern asserts that such a claim is contingent at this point in time and would arise only upon termination of the A Plan [2].

The Rolleston Complaint seeks tens of millions of dollars in actual, punitive, and treble damages. Further it requests "that the assets of Eastern Air Lines, Inc. be frozen immediately in the amount which has been determined by [the] Internal Revenue [Service] to be due the A and/or B Plan [the pilot pension plans] and that temporary and permanent injunctions be thereafter granted in the same terms." (Rolleston Complaint at 20). While the exact

---

1. On February 15, 1990, this Court entered an order denying Rolleston's request for compensation at that stage from the Eastern estate.

2. Eastern further asserts that a "termination" claim would be a pre-petition claim because it

would involve work performed and pension benefits accrued prior to the filing of the petition. However, a determination as to the status of such a claim is not necessary for a resolution of the issues currently before this Court.

nature of the requested relief is less than clear, the Rolleston Plaintiffs allege in their motion that "upon information and belief, [the Rolleston] Plaintiffs have alleged that a total of over $700 millon is due to all of the 11 benefit plans established for the benefit of employees of Eastern, including what is owed to A and B Plans, which are retirement plans for Eastern pilots." Rolleston Plaintiffs Motion at 3–4. The Rolleston Plaintiffs specifically request that the Georgia District Court "freeze" in excess of $281 million of the proceeds from the sale of Eastern's assets. Rolleston's Amendment to Plaintiffs' Motion at 2. *See also,* Rolleston Complaint at 19–20.

The Rolleston Complaint also seeks other relief including: (1) front pay calculated by the number of months remaining before each plaintiff pilot reaches retirement age in an amount no less than $15 million; (2) triple damages no less than $100 million; (3) $10 million for the deprivation of rights pursuant to 42 U.S.C. § 1983; (4) punitive damages in the amount of $10 million; and (5) costs and attorneys fees.

There is no indication that Rolleston, an active participant in this reorganization case or any of the Rolleston Plaintiffs, have sought leave for an order to lift the automatic stay in with respect to the Rolleston Lawsuit.

### RELIEF REQUESTED

Eastern moves pursuant to § 362(a)(1), (3) and (6) for a finding that the Rolleston Lawsuit violates the automatic stay and for a preliminary and permanent injunction pursuant to § 105 of the Code enjoining defendants Rolleston and the Rolleston Plaintiffs from prosecuting the Rolleston Lawsuit or any other legal action, other than a proceeding in this Court, in pursuit of the claims set forth in that action, and requiring Rolleston and the Rolleston Plaintiffs to dismiss the Rolleston Lawsuit.

### DISCUSSION

Pursuant to 28 U.S.C. § 1334(d), the "district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all of the property, wherever located of the debtor ... and of property of the estate." The District Court's jurisdiction has been referred to this Court by the "Standing Order of Referral of Cases to Bankruptcy Judges" dated July 10, 1984 (Ward, Acting C.J.). Bankruptcy courts have jurisdiction to "hear and determine ... all core proceedings ... arising in a case under title 11." 28 U.S.C. § 157(b)(1). This Court's jurisdiction is further defined by § 157(b)(2)(A), which states in pertinent part as follows:

Core proceedings include, but are not limited to

(a) matters concerning the administration of the estate.

The instant Rolleston Adversary Proceeding is a "core" proceeding pursuant to § 157(b)(2)(A).

Section 362(a)(3) of the Code provides in pertinent part as follows:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302 or 303 of this title ... operates as a stay, applicable to all entities, of—

(1) the commencement or continuation ... of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

\* \* \* \* \* \*

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

\* \* \* \* \* \*

(6) *any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title.*

11 U.S.C. § 362.

"The automatic stay prevents creditors from reaching the assets of the debtor's estate piecemeal and preserves the debtor's estate so that all creditors and their claims

can be assembled in the bankruptcy court for a single organized proceeding." *In re Ionosphere Clubs, Inc.*, 105 B.R. at 763 (citing *In re Colin, Hochstin Co.*, 41 B.R. 322, 325 (Bankr.S.D.N.Y.1984)). *See also, In re Ionosphere Clubs, Inc.*, 105 B.R. 765, 769 (Bankr.S.D.N.Y.1989); *In re Ionosphere Clubs, Inc.*, 105 B.R. at 779. "The automatic stay is intended to protect the assets of the debtor's estate from dissipation and administrative interference." *In re Johns–Manville Corp.*, 26 B.R. 420, 425 (Bankr.S.D.N.Y.1983), *aff'd*, 40 B.R. 219 (S.D.N.Y.), *rev'd in part*, 41 B.R. 926 (S.D.N.Y.1984). "The purpose of the protection provided by Chapter 11 is to give the debtor a breathing spell, an opportunity to rehabilitate its business and to enable the debtor to generate revenue." *In re Ionosphere Clubs, Inc.*, 105 B.R. at 777; *see, In re Johns–Manville Corp.*, 801 F.2d 60, 62 (2d Cir.1986); *In re Talladega Steaks, Inc.*, 50 B.R. 42 (Bankr.N.D.Ala.1985).

> [T]he paramount policy and goal of Chapter 11, to which all other bankruptcy policies are subordinated, is the rehabilitation of the debtor. This policy was clearly articulated by the United States Supreme Court in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513 [104 S.Ct. 1188, 79 L.Ed.2d 482] (1984) which stated '[t]he fundamental purpose of reorganization is to prevent the debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources.'

*In re Ionosphere Clubs Inc.*, 98 B.R. 174, 176–77 (Bankr.S.D.N.Y.1989) (quoting *Bildisco & Bildisco*, 465 U.S. at 528, 104 S.Ct. at 1197). *See, also, In re Ionosphere Clubs Inc.*, 105 B.R. at 777; *In re Ionosphere Clubs, Inc.*, 108 B.R. at 937.

The legislative history of § 362 indicates that Congress intended that the scope of the automatic stay be broad in order to effectuate its protective purposes on behalf of both debtors and creditors:

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.
>
> The automatic stay also provides creditor protection. Without it, certain creditors would not be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors....

H.R.Rep. No. 595, 95th Cong., 1st Sess. 340 (1977); S.Rep. No. 989, 95th Cong.2d Sess. 49 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5963, 6296–97.

This Court must also look to its powers pursuant to § 105(a) of the Code to expand the scope of the automatic stay provisions in order to effectively administer the assets of the Eastern estate.

> [P]ursuant to § 105(a) of the Code, "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). "[T]he Bankruptcy Court has authority under § 105 broader than the automatic stay provisions of § 362 and may use its equitable powers to assure the orderly conduct of the reorganization proceedings." [*In re Chateaugay Corp.*], 93 B.R. 26, 29 (S.D.N.Y.1988) (quoting *In re Baldwin–United Corp. Litig.*, 765 F.2d 343, 348 (2d Cir.1985)); *see also, In re Johns–Manville Corp.*, 91 B.R. 225, 227 (Bankr.S.D.N.Y.1988); *In re Chanticleer Associates, Ltd.*, 592 F.2d 70, 74 (2d Cir.1979) ("The Court's power to preserve its jurisdiction by enjoining proceedings that would remove property from the bankrupts estate is fundamental to the scheme of the Bankruptcy Act").

*In re Ionosphere Clubs, Inc.*, 105 B.R. at 778. "The reach of bankruptcy jurisdiction encompasses all matters the outcome of which could affect the debtor or its reorganization." *In re Chateaugay Corp.*, 109 B.R. 613, 621 (S.D.N.Y.1990); *see also, In re Johns–Manville Corp.*, 801 F.2d at 64; *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir.1984).

[T]he exceptions to the automatic stay of § 362(a) which are set forth in § 362(b) are simply exceptions to the stay which protect the estate automatically at the commencement of the case and are not limitations upon the jurisdiction of the bankruptcy court or upon its power to enjoin. The power is generally based upon section 105 of the Code. The court will have ample power to enjoin actions excepted from the automatic stay which might interfere in the rehabilitative process whether in a liquidation or in a reorganization case.

*In re Ionosphere Clubs, Inc.*, 105 B.R. at 778 (quoting 2 *Collier on Bankruptcy*, ¶ 362.05 at 362–43 (15th ed. 1988)).

█ The traditional standards for issuance of an injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure (the "Federal Rules"), which are made applicable herein pursuant to Bankruptcy Rule 7065, require the party requesting the injunctive relief to show:

(A) irreparable harm and

(b) either

(1) a likelihood of success on the merits or

(2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the movant.

*Joseph Scott Co. v. Scott Swimming Pools, Inc.*, 764 F.2d 62, 66 (2d Cir.1985).

*See, e.g., New York Path. & X–Ray Lab., Inc. v. Immigration & Naturalization Serv.*, 523 F.2d 79, 81 (2d Cir.1975); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979 (per curiam); *In re Feit & Drexler, Inc.*, 760 F.2d 406, 415 (2d Cir.1985); *Abdul Wali v. Coughlin*, 754 F.2d 1015 (2d Cir.1985); *In re Ionosphere Clubs Inc.*, 108 B.R. at 947. Moreover, in cases under the RLA, a factor of primary concern to the courts is the public interest in the continuation of service. *Long Island R.R. v. IAM*, 709 F.Supp. 376, 388 (S.D.N.Y.), *mod. and aff'd*, 874 F.2d 901, 910–911 (2d Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 836, 107 L.Ed.2d 831 (1990); *Trans Int'l Airlines, Inc. v. Int'l*

*Brotherhood of Teamsters*, 650 F.2d 949, 967 (9th Cir.1980), *cert. denied*, 449 U.S. 1110, 101 S.Ct. 918 & 919, 66 L.Ed.2d 839 (1981); *In re Ionosphere Clubs, Inc.*, 108 B.R. at 947.

"Since injunctions in bankruptcy cases are authorized by statute, the usual equitable grounds for relief, such as irreparable damage, need not be shown." *In re Neuman*, 71 B.R. 567, 571 (S.D.N.Y.1987); *see, In re Chateaugay*, 93 B.R. at 29; *In re Ionosphere Clubs Inc.*, 105 B.R. at 778. "Instead, the bankruptcy court may 'enjoin proceedings in other courts when it is satisfied that such a proceeding would defeat or impair its jurisdiction with respect to a case before it.'" *In re Johns–Manville Corp.*, 91 B.R. at 228 (quoting *In re Chateaugay*, 93 B.R. at 29); *In re Ionosphere Clubs Inc.*, 105 B.R. at 778; *see also, Continental Illinois Nat. Bank & Trust Co. v. Chicago, R.I. & P.R. Co.*, 294 U.S. 648, 675, 55 S.Ct. 595, 606, 79 L.Ed. 1110 (1935) ("The power to issue an injunction when necessary to prevent the defeat or impairment of its jurisdiction is, therefore, inherent in a Court of Bankruptcy, as it is in a duly established Court of Equity."); *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1008 (4th Cir.), *cert. denied*, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986).

*The Bid Procedure*

█ Rolleston's first essential allegation, whether unreinstated strikers have the right to displace Eastern's current pilot work force in order to return to work, is indistinguishable from the issues presented in the ALPA Adversary Proceeding. Although Rolleston alleges that the Rolleston Lawsuit has been filed on behalf of "approximately 1,800 former [unreinstated] striking pilots," ALPA, who still is the chosen representative of the pilots, should be permitted an opportunity to participate and develop its case on a issue which is of utmost importance to its constituency. Additionally, adjudication of this issue, now, solely in the context of the Rolleston Adversary Proceeding, would be antithetical to the concept of judicial economy and may have collateral estoppel implications as to the ALPA Adversary Proceeding. Conse-

quently, it is inappropriate to adjudicate at this time whether Rolleston's institution of the suit as to this issue violated the automatic stay. Instead, pursuant to Judge Mukasey's decision that this Court should determine the issues presented in the ALPA Adversary Proceeding and pursuant to § 105(a) of the Code and Federal Rule 16, this Court does find sufficient cause to enjoin the Rolleston Plaintiffs from continuing their suit until the substance of these allegations is determined at such time as this Court decides the issues underlying the ALPA Adversary Proceeding currently scheduled for hearing on March 27, 1990. Consequently, this Court defers determining at this time whether the inclusion of the bid procedure issue as part of the Rolleston Lawsuit violates the automatic stay.

*Property of the Estate*

■ The Rolleston Plaintiffs' second essential allegation is that Eastern has failed to fund its various pilot pension funds. In contrast, Eastern asserts that it has fully funded its pension funds as required by law, and pursuant to various waivers it has received from the Internal Revenue Service. Indeed, Eastern has sought and obtained permission of this Court to make some such payments during this case. Eastern asserts that any additional contribution payments due and owing, and any relevant related issues, will be decided in connection with confirmation of a plan of reorganization. Moreover, the Rolleston Plaintiffs' claim that Eastern owes its pilot pension funds approximately $281 million is apparently based upon the PBGC's proof of contingent claim filed in Eastern's chapter 11 case which is premised on the contingency of termination of Eastern's pension plans. That contingency has not taken place. Moreover, even assuming that the Rolleston Plaintiffs have standing to assert such a claim, they filed no timely proof of claim before the bar date.

■ In Count II of the Rolleston Lawsuit, the Rolleston Plaintiffs assert causes of action sounding in RICO, violations of the RLA, and deprivation of civil rights based on allegations that Eastern has failed to pay pilots interest on certain funds paid to them from their pension plans upon retirement. Eastern contends however, that this is yet another claim which, if not properly filed against Eastern's estate during Eastern's chapter 11 case, will be discharged by confirmation of Eastern's chapter 11 plan. *See e.g., In re Johns–Manville Corp.*, 53 B.R. 346, 350 n. 5 (Bankr.S.D.N.Y.1985).

Paragraph 35 of Count I of the Rolleston Complaint clearly demonstrates that the Rolleston Plaintiffs are seeking to control property of the estate by requesting that the Georgia District Court enjoin the disposition of what appears to be approximately $281 million of Eastern's assets.

The filing of a petition in bankruptcy creates an estate that encompasses "all legal and equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a). This provision has been broadly construed. "The scope of [§ 541(a)(1)] is broad. It includes all kinds of property, including tangible or intangible property, causes of action ... and all other forms of property currently specified in Section 70a of the Bankruptcy Act." *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n. 9 [103 S.Ct. 2309, 2313 n. 9, 76 L.Ed.2d 515] (1983) (quoting S.Rep. No. 989, 95th Cong., 2d Sess. 82 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5868).

*In re Ionosphere Clubs, Inc.*, 105 B.R. at 777.

The Rolleston Plaintiffs have confirmed in unmistakable terms that their lawsuit constitutes an effort to obtain property of the estate and to exercise control over such property, in contravention of the authority of this Court and in violation of § 362(a)(3) of the Code:

> *Assets of Eastern*, with approval of the Bankruptcy Court, have been sold for cash and the Bankruptcy court now holds several hundred million dollars from these sales.... The Plaintiffs in the original Complaint have alleged that they ... are the owners of the funds in the

hands of the Bankruptcy Court to the extent of the total amount due by Eastern to all the benefit plans. The Plaintiffs prayed in the original Complaint that this [District] Court ... freeze the funds in the custody of the Bankruptcy court so that they would not be paid out to any creditors *until the legal question is decided whether or not these monies belong to beneficiaries of the retirement plans.... Plaintiffs ... are entitled to an injunction to freeze these assets before they are distributed to creditors in the bankruptcy cases.*

Rolleston Plaintiffs' Motion at 5–6 (emphasis added).

It is beyond dispute that the Rolleston Plaintiffs seek to exercise control of at least $281 million of the cash assets of Eastern's estate by seeking to secure a court order "freezing" Eastern's assets and directing Eastern to pay this amount to the pilot pensions plans. Additionally, the Rolleston Plaintiffs appear to request a temporary restraining order that would prohibit distributions under a reorganization plan, because, according to the Rolleston Plaintiffs, "If the assets are distributed to creditors, it will be impossible for the Plaintiffs to recover those assets." Rolleston Motion at 6. This direct attempt to secure preferred status for a discrete group of creditors runs directly counter to the distribution and oversight scheme established by the Code.

The Rolleston Plaintiffs also allege that the funds they seek to recover from Eastern on behalf of the pension plans "are not Eastern's assets but ... are assets of the [Rolleston] Plaintiffs." Rolleston Complaint at 18. It would appear that the Rolleston Plaintiffs are merely asserting unliquidated, contingent pre-petition claims against the Eastern estate and have no specific interest (other than the interest that all of Eastern's creditors have in property of the estate) in the res which they are attempting to gain control over. However, the question of what is property of the estate is an issue that the bankruptcy court should resolve. As the district court explained in *In re Neuman,* where it affirmed the issuance of an injunction by the bankruptcy court enjoining a state court action:

> Even though the Bankruptcy Court may enjoin the state court action [pursuant to section 105] on the grounds that it interferes with the reorganization proceedings, the court also has the power to issue such an injunction on the grounds that the Bankruptcy Court, rather than another court, should be the forum to decide whether an asset is property of the estate.

71 B.R. at 573. Similarly, pursuant to the "broad power" vested in the bankruptcy court under § 105(a) of the Code, an injunction here is appropriate and necessary to preserve this Court's jurisdiction to decide issues that are central to the administration of Eastern's estate.

Any attempt to "freeze" Eastern's assets and obtain an order requiring Eastern to transfer cash from its estate to the pilot pension plans is a direct and blatant attempt to assert control over the assets of the estate for the benefit of the Rolleston Plaintiffs. Such a distribution will reduce the amount available to be paid to creditors and will have an adverse effect on the feasibility of any plan of reorganization. Consequently, the prosecution of the Rolleston Lawsuit could be fatal to a successful reorganization of Eastern. Additionally, the Rolleston Lawsuit interferes with this Court's exercise of its jurisdiction over essential core matters in the Eastern case, including claims issues and confirmation of a plan of reorganization.

Count Two of the Rolleston Complaint alleges that certain pension funds that were due to pilots who had elected to retire were held by Eastern or the other defendants for a period of time before they were paid to the retiring pilots, and that these pilots were entitled to receive interest on these payments for the period of time that the monies were held by Eastern. As such, Count II represents a clear effort to assert a claim against the estate and to control property of the estate.

In accordance with the foregoing, pursuant to § 362(a)(1), (3) and (6) of the Code,

this Court finds that the relief requested regarding the pension plan funding issue and Count II of the Rolleston Lawsuit violates the automatic stay.

*The Codefendants*

"The power of the Bankruptcy Court to issue an injunction in order to preserve the integrity of the reorganization process is well established." *In re Chateaugay Corp., supra*, 93 B.R. at 621. Recognizing the policy concerns of Congress in considering the scope of the automatic stay of § 362(a)(1), courts have held that the protection of the automatic stay may reach beyond direct actions against the debtor to stay non-debtor lawsuits. For example, the Fourth Circuit in *A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir.), *cert. denied*, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986) stated that § 362(a)(1) applies to non-bankruptcy parties "when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment against the debtor." *Id.* at 999. *See also, In re Ms. Kipps, Inc.*, 34 B.R. 91 (Bankr.S.D.N.Y.1983).

"The large majority of the courts which have considered the question have held that the bankruptcy courts have the power to restrain legal action by creditors of the debtor against non-debtor third parties, in certain circumstances, pursuant to 11 U.S.C. § 105" *In re Monroe Well Service, Inc.*, 67 B.R. 746, 751 (Bankr.E.D.Pa.1986); *See e.g., In re Chateaugay Corp., supra*, 109 B.R. at 621–22; *A.H. Robins Co. v. Piccinin*, 788 F.2d at 1008; *In re Codfish*, 97 B.R. 132, 135 (Bankr.D.Puerto Rico 1988); *In re Johns–Manville Corp.*, 26 B.R. 420, 425 (Bankr.S.D.N.Y.1983), (Court under § 105 of the Code enjoined all litigation and discovery of the debtor's employees), *aff'd*, 40 B.R. 219 (S.D.N.Y.1984) (no need to decide whether § 362 of the Code automatically stays all discovery of employees since bankruptcy court can enjoin such discovery under § 105 of the Code), *rev'd in part*, 41 B.R. 926 (S.D.N.Y.1984) (limited discovery from debtor's employees may be allowed where it is shown that the debtor retains sole custody of such discovery).

Pursuit of the Rolleston Lawsuit against the other defendants will surely involve, burden and directly impact Eastern, and will likely prejudice Eastern's future defense against identical claims based upon identical facts. Where, as here, a proceeding against a debtor's codefendants would adversely affect the debtor's estate, a court may enjoin the action as to all defendants pursuant to its authority under § 105 of the Code. *See, In re Johns–Manville Corp.*, 26 B.R. at 427. In particular, the courts have recognized that a stay should be provided to codefendants when the claims against them and the claims against the debtor are "inextricably interwoven, presenting common questions of law and fact, which can be resolved in one proceeding." *Federal Life Ins. Co. v. First Financial Group Inc.*, 3 B.R. 375, 376 (S.D. Tex.1980); *accord, In re Johns–Manville Corp.*, 26 B.R. 405, 418 (Bankr.S.D.N.Y. 1983).

In view of the foregoing, the issuance of an injunction under § 105 of the Code is clearly justified and is supported by precedent. In *In re Johns–Manville Corp.*, 33 B.R. 254 (Bankr.S.D.N.Y.1983), this Court, pursuant to §§ 105 and 362 of the Code, held as follows:

> [T]his Court, pursuant to Section 105(a) of the Bankruptcy Code, may extend the automatic stay under Section 362 of the Bankruptcy Code to stay and enjoin proceedings or action by or against non-debtors where such actions would interfere with, deplete or adversely affect property of the [debtor] estate or which would frustrate the statutory scheme embodied in Chapter 11 or diminish [debtor's] ability to formulate a plan of reorganization.

33 B.R. at 263. Here, prosecution of the Rolleston Lawsuit threatens not only to disrupt Eastern's operations, but also to deprive this Court of the ability to decide issues that are central to the administration of Eastern's estate and critical to Eastern's reorganization.

 Additionally, if the Rolleston Plaintiffs are permitted to prosecute their lawsuit against Eastern's codefendants, issues critical to the pending ALPA Adversary Proceeding may be resolved without providing Eastern an opportunity to present an effective defense. For example, a finding of liability on the part of its codefendants with respect to the Rolleston Plaintiffs' RICO claims could foreclose an effective defense by Eastern in a subsequent suit. Under RICO, a conspiracy can be established by showing that the defendant agreed to commit a racketeering offense through agreeing to participate in two predicate acts. *See, United States v. Rastelli,* 870 F.2d 822, 828 (2d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 515, 107 L.Ed.2d 516 (1989). A conspirator need not know all the details of the conspiracy nor need a conspirator participate in every aspect of the conspiracy. *See, United States v. Rapp,* 871 F.2d 957, 965 (11th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 233, 107 L.Ed.2d 184 (1989). Consequently, a finding of liability as to Eastern's codefendants may be extended to Eastern, and collateral estoppel may bar Eastern from litigating factual and legal issues critical to its defense. *See, e.g., In re Lion Capital Group,* 44 B.R. 690, 702–03 (Bankr.S.D.N.Y.1984).

 Furthermore, the Rolleston Lawsuit is directed against, *inter alia,* Mr. Lorenzo, Chairman of Eastern's Board of Directors. To the extent the Rolleston Lawsuit seeks recovery from Mr. Lorenzo, it can have a direct impact on the estate based upon Eastern's June 1987 amended certificate of incorporation which requires indemnification of Mr. Lorenzo for any litigation expenses or liability resulting from his conduct as an Eastern official. Moreover, if successful against Mr. Lorenzo, the Rolleston Plaintiffs may undoubtedly claim Eastern is liable for his conduct in his capacity as Chairman of Eastern's Board of Directors. Due to the risk of possible adverse findings under theories of collateral estoppel and respondeat superior, Eastern will be forced to protect its interests if the Rolleston Lawsuit is allowed to proceed as to the other parties. Consequently, the Lawsuit will inevitably involve Eastern in the litigation and burden Eastern with discovery. Additionally, this Court finds that the indemnification rights of Mr. Lorenzo make their interests "so intimately intertwined with those of the debtor that the latter may be said to be the real party in interest," thereby justifying an extension of the automatic stay under § 105 of the Code. *A.H. Robins Co. v. Piccinin,* 788 F.2d at 1001. Thus, the only way Eastern can have the benefit of the automatic stay is if the Rolleston Lawsuit is enjoined as to all parties.

Moreover, should the Rolleston Lawsuit be allowed to proceed against parties key to the reorganization, substantial amounts of time will be diverted, to the obvious detriment of Eastern's reorganization. "The massive drain on [key officers'] time and energy at this crucial hour of plan formulation in either defending themselves or in responding to discovery requests could frustrate if not doom their vital efforts at formulating a fair and equitable plan or reorganization." *In re Johns–Manville Corp.,* 26 B.R. at 426. Because the Chairman is a central actor in Eastern's rehabilitation, he "must be free ... to devote all [his] efforts to the operation of the business *and* the formulation of a plan." *In re MacDonald/Associates, Inc.,* 54 B.R. 865, 870 (Bankr.D.R.I.1985) (emphasis in original).

Over the past weeks, Eastern has been involved in exhaustive negotiations with its creditors and the Examiner in an attempt to produce an acceptable reorganization plan. As Eastern prepares to finalize and file its plan of reorganization, it needs the full attention of its officers and directors. Because the suit would ultimately divert the debtor's resources and attention from the bankruptcy process, and possibly deprive this Court of control over issues central to its administration of the case, it is necessary to enjoin Rolleston and the Rolleston Plaintiffs from continuing the Rolleston Lawsuit.

## CONCLUSION

In conclusion, this Court finds: (1) that there is a substantial likelihood that East-

ern will prevail on the merits; (2) that even under the irreparable harm standard of this Circuit, Eastern has clearly demonstrated that it will be irreparably harmed by the Rolleston Lawsuit going forward; and (3) that the threatened injury to Eastern outweighs any harm the proposed injunction may cause the Rolleston Plaintiffs. Hence, Eastern's request for a preliminary injunction pursuant to § 105 of the Code is hereby granted. Additionally, pursuant to § 362(a)(1), (3) and (6) of the Code, this Court finds that the relief requested regarding the pension plan funding issue and Count II of the Rolleston Lawsuit violates the automatic stay.

In accordance with the foregoing, a Preliminary Injunction Order has been simultaneously entered.